UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| UNITED STATES OF AMERICA, Plaintiff, v. STEVEN CASEY GALLINGER, Defendant. | Case No. 1:16-cr-00066-BLW<br><br>MEMORANDUM DECISION AND ORDER |
|---|---|

# INTRODUCTION

The Court has before it Defendant Steven Casey Gallinger's Motion to Suppress (Dkt. 15). The Court held an evidentiary hearing on the motion on December 19, 2016, where it heard testimony from Officers Logan Terry and Joseph Martinez. At the close of the hearing, the Court took the matter under advisement. For the reasons explained below, the Court will grant the motion.

# FACTUAL BACKGROUND

On October 4, 2015, at approximately 12:55 a.m., Ada County Sheriff's Dispatch received a 911 call. The call operator could hear a scuffling noise in the background and voices of males who seemed to be arguing. The line was busy when the call operator made an initial call-back attempt. However, dispatch was able to trace the call to a location within 19 meters of an address on Amber Street between West Bond and West

Cruzen Streets in Boise, Idaho. Dispatch then relayed the call over the radio.

Boise Police Officer Logan Terry was nearby and responded to the dispatch. He parked his patrol car near the intersection of Amber and Fairview, one block south of the intersection of Amber and Bond. Shortly after exiting his vehicle, Officer Terry observed a male, later identified as defendant Steven Gallinger, appearing to have emerged from the alley behind a business on the corner of Amber and Fairview. Gallinger was wearing a puffy black jacket, black shorts, a black hat, and a bandana. Officer Terry made contact with Gallinger and directed him to sit on the sidewalk. He then began questioning Gallinger, asking for his name and what he was doing. Gallinger indicated his name was "Steven Cox."

As Officer Terry was questioning Gallinger, dispatch broadcast that they had received another phone call related to the hangup call. Dispatch indicated that the reporting party had been approached by an individual, described as a white male with a blue bandana and a black coat, who had then walked southbound on Amber. Dispatch further advised that the reporting party had given the male nine dollars to leave.

Within several minutes of Officer Terry's first contact with Gallinger, Officer Martinez arrived at Officer Terry's location. Officer Martinez, who had previously encountered Gallinger, indicated that "Cox" was not his true surname. Officer Martinez then left to speak to the party who had made the 911 call. That individual told Officer Martinez that a person had approached him in his front yard and asked for money, food, and shelter. The reporting party indicated that the male was fidgeting with a bandana that

was partially covering his face, and that the man's demeanor made him uncomfortable.

Officer Martinez returned to the location where Officer Terry was speaking with Defendant. Officer Martinez testified that he believed that the Defendant may have been contemplating committing a theft or robbery based on the information he had received from the reporting party. Officer Martinez then asked Gallinger if he had any weapons on his person and asked whether he could pat Gallinger down. Gallinger refused to consent to a search of his person.

Officer Martinez then informed Gallinger that he was under arrest for providing a false identity to police. Officer Martinez instructed the Defendant to stand up and place his hands behind his back. At that point, Gallinger took off running from officers. He was eventually apprehended. The officers found the handgun that is the basis for the instant charge in the path of Gallinger's flight.

Gallinger was charged with unlawful possession of a firearm. He now seeks to suppress the firearm that is the basis for this charge, on the grounds his initial detention was an unlawful seizure under the Fourth Amendment.

## ANALYSIS

Gallinger argues that he was unlawfully detained when Officer Terry ordered him to sit on the sidewalk without reasonable suspicion that criminal activity was afoot or that he was linked to the 911 call, and that the firearm must therefore be excluded as the fruit of an illegal seizure. The Government counters by arguing that Officer Terry's initial contact with Gallinger was not a seizure for Fourth Amendment purposes, because

Gallinger voluntarily cooperated by remaining at the scene. In the alternative, the Government argues that even if the officer's initial contact with the Defendant was a seizure, it was a permissible *Terry* stop supported by reasonable suspicion. Finally, the Government argues that even if the seizure was illegal, suppression is not warranted because intervening events broke the causal connection between the alleged illegal seizure and the discovery of the firearm.

**1.     Constitutionality of the *Terry* Stop**

The Fourth Amendment protects the "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." U.S. Const. amend. IV. Searches and seizures conducted without a warrant are per se unreasonable, subject to certain limited and well-defined exceptions. *See Minnesota v. Dickerson*, 508 U.S. 366, 372 (1993). One such exception is the so-called *Terry* stop, which allows an officer to briefly detain a person when the officer has reasonable suspicion that criminal activity is afoot. *Terry v. Ohio*, 392 U.S. 1 (1968). Reasonable suspicion "exists when an officer is aware of specific, articulable facts which, when considered with objective and reasonable inferences, form a basis for *particularized* suspicion." *United States v. Montero–Camargo*, 208 F.3d 1122, 1129 (9th Cir. 2000) (en banc) (emphasis in original).

"The proponent of a motion to suppress has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure." *Rakas v. Illinois*, 439 U.S. 128, 130 n. 1 (1978) (citing *Simmons v. United States*, 390 U.S. 377,

389–390 (1968)). In the case of a warrantless search or seizure, however, the Government bears the burden of proving by a preponderance of the evidence that one of the delineated exceptions to the warrant requirement applies. *See United States v. Huguez–Ibarra*, 954 F.2d 546, 551 (9th Cir. 1992).

### A. *Gallinger Was Seized by Officer Terry*

In determining whether a Fourth Amendment violation has occurred, the Court begins with the question of whether Officer Terry seized Gallinger. Gallinger argues that he was seized when Officer Terry directed him to sit on the curb. The Government argues that the encounter was voluntary, and therefore not a *Terry* stop.

The Supreme Court has long established that not every police-citizen contact rises to the level of a seizure. *Florida v. Bostick*, 501 U.S. 429, 434 (1991). A consensual encounter, in which an officer approaches an individual in a public place and merely asks a few questions, does not trigger Fourth Amendment scrutiny, provided that the officer does not imply that a response is obligatory. *See id.; Florida v. Royer*, 460 U.S. 491, 497 (1983). Only when an officer, "by means of physical force or show of authority, has in some way restrained the liberty of a citizen" does a seizure occur. *Mendenhall*, 446 U.S. 544, 552 (1980). With respect to a show of authority, as opposed to physical force, a seizure occurs only where the subject yields or submits to the assertion of authority. *See California v. Hodari D.,* 499 U.S. 621, 626 (1991).

In determining whether there has been a show of authority, courts must examine all of the surrounding circumstances to determine whether a reasonable, innocent person

would feel that "he was not at liberty to ignore the police and go about his business." *Florida v. Bostick*, 501 U.S. 429 (1991). Relevant circumstances include: (1) the time and place of the encounter, (2) the number of officers on the scene; (3) use of language or tone indicating that compliance with the officer's request might be compelled; (4) intimidating movements or authoritative manner; (5) physical touching or application of force; (6) whether the officer displayed a weapon or was in uniform; (7) restriction of the detainee's movements; and (8) whether the detainee was advised of his right to terminate the encounter. *See United States v. Mendenhall*, 446 U.S. 544, 554 (1980); *Orhorhaghe v. INS*, 38 F.3d 488 (9th Cir. 1994).

Applying *Bostick*'s totality of the circumstances test, with an eye toward the factors listed above, the Court concludes that Gallinger was seized when Officer Terry ordered him to sit on the curb for the purpose of restraining his freedom of movement. There is some uncertainty as to the language used to initiate the encounter. However, Officer Terry's police report, prepared while the events were fresh in his mind, states that Officer Terry "made contract with the male and *had him sit on the ground*." Ex. A at 1 *(emphasis added).* Importantly, the report does not suggest that Officer Terry extended any explicit choice or merely solicited Gallinger's voluntary cooperation. Furthermore, the request extends beyond the "mere questioning" described in *Bostick*. Even if phrased as a question rather than a command, Officer Terry's request that Gallinger stop walking and sit on the curb was a clear expression of authority. This practice, according to Officer Terry's testimony, is intended to restrict a suspect's freedom of movement and allow the

officer to gain control of a situation, as a person seated on the ground or curb cannot run or fight as quickly as a person standing. This type of restraint of a person's freedom to walk away is clearly encompassed by the Fourth Amendment. *See Brower v. County of Inyo*, 489 U.S. 593, 595 (1989) (*quoting Tennessee v. Garner*, 471 U.S. 1, 7 ("[W]henever an officer restrains the freedom of a person to walk away, he has seized that person."). Gallinger also submitted to the show of authority, satisfying the requirement added by *Hodari D.*

The surrounding circumstances only add to the coerciveness of the situation. The confrontation occurred late at night, while Officer Terry was in full uniform, near his marked patrol car, and carrying a weapon visible to the Defendant. Gallinger was alone when approached by Officer Terry, adding to the potential intimidation. *Cf. United States v. Ward*, 961 F.2d 1526, 1532–33 (10th Cir. 1992) (finding that a "person who is alone when approached by law enforcement officers is more likely to feel that he or she was the specific object of the officers' inquiry" and therefore less likely to feel free to terminate the encounter). Finally, Gallinger was not told that he was free to terminate the encounter. *See Florida v. Bostick*, 501 U.S. 429, 432 (1991) (finding it significant that officers told the defendant that he could refuse consent).

Certain facts do march in the opposite direction. Officer Terry did not touch or physically restrain Gallinger or brandish his weapon. At least initially, he was the only officer at the scene. Officer Terry also used a regular tone of voice and spoke calmly with Gallinger. However, on the record as a whole, the Court finds that a reasonable person

would not have felt free to leave under these circumstances. As a result, the Court concludes that Gallinger was seized within the meaning of the Fourth Amendment during the initial encounter with Officer Terry.

  B. *Officer Terry Lacked Reasonable Suspicion to Justify the Seizure*

Under *Terry*, a brief stop and detention of a person for investigative purposes does not violate the Fourth Amendment so long as the officer has "reasonable suspicion" that criminal activity may be afoot. To determine whether a stop was supported by reasonable suspicion, a court must "consider whether, in light of the totality of the circumstances, the officer had a particularized and objective basis for suspecting the particular person stopped of criminal activity." *U.S. v. Palos-Marquez*, 591 F.3d 1272, 1274-1275 (9th Cir. 2010) (internal citation omitted). However, a mere "hunch" or "inchoate and unparticularized suspicion" will not suffice. *See Terry*, 392 U.S. at 27.

The totality of the circumstances at the moment when Officer Terry ordered Gallinger to sit on the curb is informed by a limited set of facts. The Government argues that the 911 hang-up call, the late hour, Defendant's proximity to the call location, and Gallinger's suspicious appearance combined to create reasonable suspicion that he was engaged in criminal activity.

A handful of cases from other circuits suggest that a suspect's proximity to a crime scene is a factor supporting a finding of reasonable suspicion. *See, e.g.*, *U.S. v. Brown*, 334 F.3d 1161 (D.C. Cir. 2003) (finding the location of suspects' car in lot where late night shots had been fired a relevant factor); *U.S. v. Wimbush,* 337 F.3d 947 (7th Cir.

2003) (noting as a relevant factor the fact that suspect was found eight blocks away from reported crime); *U.S. v. Brown,* 159 F.3d 147 (3d. Cir. 1998) (suspect's presence in "close proximity to the crime scene a few minutes after the [report]" a factor supporting finding of reasonable suspicion); *U.S. v. Juvenile TK*, 134 F.3d 899 (8th Cir. 1998) (affirming validity of a *Terry* stop of a gray vehicle found 2 blocks from the reported theft of a grey vehicle, relying in significant part on the "temporal and geographical proximity of the car to the scene of the crime.").

However, police are not entitled, under the guise of Terry, to stop a person simply for being in the vicinity of a suspected crime. *See Terry,* 392 U.S. at 29; *Illinois v. Wardlow*, 528 U.S. 119 (2000). Something more is necessary to raise suspicion that a person is the one engaged in wrongdoing. The Officer must have "a particularized and objective basis for suspecting the particular person stopped of criminal activity." *Navarette v. California*, 134 S.Ct. 1683, 1687 (2014). Thus, in each of the above-mentioned cases, the officers were presented with a set of circumstances—reliable evidence that a specific crime had occurred, a description of the suspect, or the defendant's suspicious flight from the area—that combined to justify the officers' reasonable suspicion. That combination is lacking here.

First, the 911 hang-up call was wholly devoid of any specific or articulable information that a crime was occurring or who might be involved. The only information dispatch gleaned from the first phone call was that "they could hear what sounded like 2 men talking, a little scuffling." On call back, dispatch heard a man say "sorry" and then

some arguing. The caller then disconnected. Only after stopping Gallinger did Officer Terry learn from dispatch that the 911-caller had called back to report suspicious activity at his house. Citizens call 911 for any number of reasons: to report criminal activity, a medical emergency, a fire, a domestic dispute, or even as the result of a misdial. Thus, a hang-up call communicating no information, aside from some scuffling noises or an argument among those heard in the background, does not provide reliable grounds to conclude that criminal activity is afoot. At best, the 911 hang-up call, as viewed through the training and experience of law enforcement officials, supported a hunch that there may or may not have been an emergency, which might or might not have included criminal activity, at or near the address from which the call was placed. *Cf. Navarette v. California*, 134 S. Ct. 1683, 1690 (2014) ("Even a reliable tip will justify an investigative stop only if it creates reasonable suspicion that criminal activity may be afoot.") (internal quotations omitted).

Furthermore, without any corroborating or identifying information from the caller, the 911 hang-up was the equivalent of an anonymous tip and therefore an unreliable source to begin with. *Florida v. J.L.*, 529 U.S. 266, 274 (2000). An "emergency 911 call is entitled to greater reliability than an anonymous tip concerning general criminality" because "the police must take 911 emergency calls seriously and respond with dispatch." *United States v. Terry-Crespo*, 356 F.3d 1170, 1175–76 (9th Cir. 2004). Nonetheless, even 911 calls must "carry sufficient indicia of reliability," before the police may rely on them. *Id.* Absent other corroborating evidence, therefore, the 911 hang-up call alone was

insufficient to substantiate the conclusion that criminal activity was indeed afoot. *Cf. United States v. Davis*, 235 F.3d 584, 587–88 (D.C. Cir. 2000) (stating that a 911 tip that a man dressed in black was fleeing from a particular address made no assertion of criminal activity and fell "far short of what Terry requires"), *cert. denied*, 534 U.S. 860 (2001).

Finally, the 911 call provided no information from which to specifically identify a suspect or to determine that anyone involved had left the scene on foot. Gallinger's only connection to any suspected crime was his location in the general vicinity of the 911 caller. His mere presence in the area was not necessarily suspicious on its own, despite the late hour and relatively deserted streets. While the commercial businesses in the area were closed, it was entirely possible that Gallinger lived in one of the nearby residences, was heading to or from a friend's home in the area, or was staying at one of the three hotels or motels within a three-block radius.

For similar reasons, the court in *United States v. Cohen*, 481 F.3d 896 (6th Cir. 2007) found that facts comparable to ours were insufficient to justify a *Terry* stop. In that case, officers responded to an early morning 911 hang-up call originating from a specific address. *Id*. at 897. An officer arrived in the area within four minutes of the call, on what the police characterized as a "trouble run" and pulled over a car turning out of the cul-de-sac from which the call originated. *Id.* The Sixth Circuit suppressed a firearm eventually discovered in the illegal stop. The court explained:

> Even if we were to assume that an anonymous 911 report is more reliable than other similar anonymous tips . . . we believe that the virtually complete lack of

> information conveyed by the silent 911 hang-up call and the total absence of corroborating evidence indicating that criminal activity was afoot requires us to give the 911 hang-up call little weight in evaluating the totality of the circumstances.

*Id.* at 901. *Accord United States v. Camacho,* 661 F.3d 718, 727 (1st Cir. 2011) (finding a stop unjustified under the principles of *Terry* where "the most that can be said is that the two men were observed in a high crime area walking away from the vicinity of a street fight that one caller reported as involving Latin Kings").

Here, as in *Cohen*, Officer Terry had no particular information that criminal activity was actually afoot and nothing to link Gallinger to the possible criminal activity, aside from his location in the vicinity of the 911 call location. As in *Cohen*, these bare facts do not amount to reasonable suspicion that Gallinger was involved in criminal activity.

Finally, we give deference, as we must, to Officer Terry's instincts and experience in concluding that Gallinger's appearance and movements—clothes which were seemingly inappropriate for the weather, hat pulled low over his eyes, bandanna used to cover his face, puffy coat in which he could be hiding a weapon, and route near several closed businesses—were suspicious. Indeed, the officer's intuition yielded fruit in this case. However, by Officer Terry's own admission, his suspicions amounted to nothing more than a hunch that Gallinger was involved in criminal activity. Officer Terry agreed, during cross examination, that he did not have enough information on which to detain Gallinger at the time of their initial encounter. While the analysis is an objective one, the

Court finds this testimony persuasive.[1]

Under these circumstances, the facts fall short of an objectively reasonable, articulable, and particularized basis for suspecting Gallinger of criminal activity at the time he was detained. Accordingly, the seizure of Gallinger was unlawful under the Fourth Amendment.

## 2. The "Attenuation" Exception to the Exclusionary Rule Does Not Apply

Gallinger argues that the handgun that is the basis of this case was obtained as a result of the illegal seizure and therefore must be suppressed under the exclusionary rule. The Government counters that the firearm should not be suppressed because its discovery was sufficiently remote from the unconstitutional police conduct.

Under the exclusionary rule, a criminal defendant may move to suppress evidence that was obtained in violation of his or her Fourth Amendment rights. *See Wong Sun v. United States*, 371 U.S. 471, 488 (1963). This prohibition applies to both "primary evidence obtained as a direct result of an illegal search or seizure' and, relevant here, 'evidence later discovered and found to be derivative of an illegality,' the so-called 'fruit of the poisonous tree.'" *Utah v. Strieff*, 136 S. Ct. 2056, 2061 (2016) (*quoting Segura v. United States*, 468 U.S. 796, 804 (1984)). "[T]he indirect fruits of an illegal search or arrest

---

[1] Given the defense's attempt to impeach Officer Terry's testimony, it seems appropriate to note that the Court found his testimony to be credible. He did not hesitate, on direct and cross examination, to testify to facts which he knew to be true, but which undermined the Government's position on the Defendant's motion to suppress. However, he is not to be criticized for undermining the Government's case. Rather, he is to be complimented for his integrity and honesty.

should be suppressed when they bear a sufficiently close relationship to the underlying illegality." *New York v. Harris*, 495 U.S. 14, 19 (1990). Suppression is not appropriate, however, if "the connection between the illegal police conduct and the discovery and seizure of the evidence is 'so attenuated as to dissipate the taint.'" *Segura v. United States*, 468 U.S. 796, 805 (quoting *Nardone v. United States*, 308 U.S. 338, 341 (1939).

Here, the firearm allegedly discarded by Gallinger was undoubtedly derivative of the illegal seizure, because without the unlawful seizure, Boise Police would not have been able to demand Gallinger's identity, to arrest him for providing a false name, and to then discover the firearm that is the basis of the current charge. Thus, the central question is whether the evidence is sufficiently attenuated from the unconstitutional police conduct.

In *Brown v. Illinois*, the Supreme Court identified three factors for determining whether the causal chain has become too attenuated: (1) the temporal proximity between the conduct in question and the discovery of the evidence, (2) the presence of intervening circumstances, and (3) the purpose and flagrancy of the official misconduct. 422 U.S. 590, 603–04 (1975). None of these factors, either individually or collectively, dissipate the taint of the unlawful seizure of Gallinger in this case.

As for the first *Brown* factor, temporal proximity, only 20–30 minutes elapsed between the illegal stop and the attempted pat search. Typically, a period of less than several hours is insufficient to purge the taint of an illegal search. *See, e.g.*, *Taylor v. Alabama,* 457 U.S. 687, 691 (1982) (finding that a confession made six hours after an

illegal arrest was not sufficiently attenuated where suspect remained in police custody, was unrepresented by counsel, had been questioned, fingerprinted, and subjected to a lineup); *Brown,* 422 U.S. at 604–05 (finding that a confession made two hours after an illegal arrest was not sufficiently attenuated where the arrest itself was a blatantly improper "expedition for evidence" and no significant intervening event occurred). Thus, this factor weighs in Gallinger's favor.

Turning to the second factor, the presence of intervening circumstances, the Government argues that Gallinger's attempted flight and the new information obtained from the 911 caller were two intervening circumstances of significance. Neither suffices to purge the taint of the illegal seizure, however. It is true that a defendant's voluntary flight and abandonment of evidence can remove the taint of an illegal seizure. *See, e.g.*, *United States v. Dawdy*, 46 F.3d 1427, 1430–31 (8th Cir. 1995) (collecting cases and holding that "a defendant's response to even an invalid arrest or Terry stop may constitute independent grounds for arrest," and that "the evidence discovered in the subsequent searches of [the defendant's] person" is admissible).

However, the abandonment must be truly voluntary and not merely the product of illegal police conduct. For that reason, a number of Circuits have declined to find attenuation due to a defendant's flight from an illegal police seizure. *See, e.g.*, *United States v. Brodie*, 742 F.3d 1058, 1060 (D.C. Cir. 2014) (detainee's flight and abandonment of evidence were not intervening circumstances because they flowed directly from seizure and the flight in itself did not pose any threat or constitute a new

crime); *United States v. Bailey*, 691 F.2d 1009, 1015 (11th Cir. 1982) (finding no attenuation where the suspect "fled moments after the illegal arrest and nothing intervened between his arrest and flight."). *Cf. United States v. Beck*, 602 F.2d 726 (5th Cir. 1979) (suppressing property tossed out of the window during an illegal stop because the "acts of abandonment do not reflect the mere coincidental decision of Beck and his passenger to discard their narcotics; it would be sheer fiction to presume they were caused by anything other than the illegal stop.").[2]

Where Courts have found attenuation in a defendant's flight, it has been premised on a determination that the flight was a truly independent and voluntary act by the defendant; constituted a new, distinct crime; or posed a serious risk to public safety. *See, e.g., United States v. Allen*, 619 F.3d 518, 526 (6th Cir. 2010) (declining to suppress where defendant "attempt[ed] to escape from police by leading the officers on a high-speed chase," which "constituted a new, distinct crime"); *United States v. Boone*, 62 F.3d 323, 324 (10th Cir. 1995) (declining to suppress where vehicular flight posed serious risks to the public safety; *United States v. Bailey*, 691 F.2d 1009, 1016–18 (11th Cir. 1982) (concluding that attenuation exists "if the defendant's response is itself a new,

---

[2] The Government argues that under *Hodari D.*, the "Defendant's flight after being told he was under arrest ended any seizure." *Gov't br.* at 7. The Court disagrees. Gallinger clearly submitted to Officer Terry's command here, by sitting on the curb when instructed to do so. Whether or not he later fled does not alter the fact that an illegal seizure occurred. Indeed, *Hodari D.* does not stand for the proposition that a defendant who has already been unlawfully seized, but later flees, breaks any causal chain between the initial illegal seizure and events occurring after the flight. 499 U.S. at 626 (1991). That is a separate question altogether. *Accord United States v. Brodie*, 742 F.3d 1058, 1061 (D.C.Cir.2014) (holding that "the short duration of [the defendant's] submission means only that the seizure was brief, not that no seizure occurred."); *United States v. Coggins*, 986 F.2d 651, 653 (3d Cir. 1993) (same); *United States v. Wilson*, 953 F.2d 116 (4th Cir. 1991) (same).

distinct crime").

None of these conditions is present here. Gallinger's flight was not a coincidental act of his free will but rather a direct result of his illegal detention. Nor did his flight on foot constitute a new distinct crime or threat to public safety.

The government next argues that the additional information provided to Officer Martinez by the 911 caller was a significant intervening event. The government cites no support for the proposition that the discovery of new evidence implicating an illegally seized individual can serve as an intervening circumstance.[3] Furthermore, under the circumstances here, the newly-obtained information simply fails to purge the taint of the illegal detention. The information was obtained by the Officers on the scene while Gallinger was illegally stopped, through the very investigation that should have preceded his detention. Even assuming that the newly-obtained information would have supported Gallinger's detention or arrest, it is not sufficiently attenuated from the illegal detention. To hold otherwise would give officers a license to temporarily detain a person on a mere hunch, safe in the knowledge that later-obtained evidence could be used to protect the fruits of the seizure from exclusion. This outcome would erode the protections of the Fourth Amendment and the deterrence rationale of the exclusionary rule.

As for the third and final factor, the purpose and flagrancy of the misconduct,

---

[3] The Supreme Court's holding in *Rawlings v. Kentucky*, 448 U.S. 98 (1980) has occasionally been mischaracterized as supporting that proposition. *See United States v. Shaw*, 464 F.3d 615, 629 (6th Cir. 2006) (finding the same, and concluding that "post-arrest discovery of new evidence" through interviews conducted with witnesses while defendant was being interrogated did not constitute intervening circumstance).

Officer Terry's conduct was purposeful but seems to have been in good faith. However, the Supreme Court clarified in *Brown* that the purposefulness factor is met where, as here, the purpose of the illegal detention was to investigate or question the suspect. *Brown*, 422 U.S. at 605 (finding that the third factor favors exclusion where a suspect was illegally detained "in the hope that something might turn up."). Furthermore, the lack of bad faith conduct is insufficient, standing alone, to prevent application of the exclusionary rule. *See United States v. Perez-Esparza*, 609 F.2d 1284, 1291 (9th Cir. 1979).

Accordingly, the Court concludes that the Government has not met its burden of proving attenuation. Therefore, the firearm seized by the officers must be suppressed as the fruit of an unlawful seizure.

## ORDER

**IT IS ORDERED:**

1. Plaintiff's Motion to Suppress (Dkt. 15) is **GRANTED,** and the firearm seized following the detention of Gallinger is **SUPPRESSED** from the Government's case in chief.

DATED: January 4, 2017

B. Lynn Winmill
Chief Judge
United States District Court